Case number 17-7116. Shabtai Scott Shatsky, individually and as personal representative of the estate of Karen Shatsky, et al., appellate for the Palestine Liberation Organization, et al. Mr. Singh, the appellate. Mr. Berger, the appellate. Mr. Singh, good morning. Good morning, Judge Henderson, and may it please the Court. Of course, I'm here to answer questions, and there are a lot of issues in the case. Happy to talk about any. But if I get to pick, I'd like to start with our claims for secondary liability. Okay. Let's say you don't get to pick, because we've got both two jurisdictional issues on personal jurisdiction and on non-final actions. So could you address those? Yes, Your Honor. I'll start with appellate jurisdiction. That point is we think there's clearly appellate jurisdiction because there was a final judgment in the court below. All of the claims that are remaining in this civil action were resolved against us, and we've appealed from that final judgment. The fact that 11 years prior to that, certain other defendants were voluntarily dismissed doesn't undermine the finality of that order. And to be clear, no case has been cited suggesting otherwise. The only cases that have been cited about voluntary dismissal undermining finality involve a very specific fact pattern. That is, a non-final adverse judgment is entered against the plaintiff, and the plaintiff tries to manufacture finality by voluntarily dismissing its remaining claims subsequently to that. That didn't happen in this case. Isn't that similar to what happened here? I mean, you dismissed the Syrian defendants so that you could get a final judgment against these defendants? No, I don't think that's right, Your Honor. I think that the reason the Syrian defendants were dismissed was not to manufacture appellate jurisdiction at all. At the time, we had a favorable order that we were looking toward pursuing to a default judgment. I think what we have here in this case was a case where it was just recognized that these really are two different cases, and so the case against the Syrian defendants should be in a different case. It's different about that case. It's the same, all the same, it's the same transaction and occurrence, right? Some of the underlying facts are the same, but of course, Your Honor, that happens all the time. There frequently are examples where a defendant engages in, of course, a conduct. Imagine a pollution incident, for example. And if multiple plaintiffs who are all injured sue that defendant, and those cases aren't consolidated, the finality of one of those cases would never affect the finality of the others, even if the cases had been consolidated. It's not allowed to split claims. I mean, that's why we have Rule 19 and Rule 20, right? And as a practical matter, the other lawsuit is on hold pending the resolution of this one because the issues are identical. I think there is considerable overlap. I wouldn't go so far as to say that the issues are identical. I think the ways that the Syrian defendants supported the PFLP or alleged to support the PFLP are different than the ways that these defendants support the PFLP. And of course, as you see from the way the substantive litigation went, those issues may well be dispositive. Judge Leon's order is based entirely on the issue of proximate cause, which is going to be adjudicated very differently depending on the type of support given to the PFLP by a particular defendant. So I don't think it's right that there's that kind of overlap. I will also say, and we've cited these cases in our opening brief on the question of appellate jurisdiction. This is footnote one. We've cited a couple of out-of-circuit cases that adopt the bright-line rule that I told you about earlier, which is that when you have this situation, that is, where a voluntary dismissal occurs prior to the allegedly non-final order, then what you have is no problem at all as long as the second order resolves all the remaining claims in the civil action. And so I think you would have to, at a minimum, create a circuit split with those courts to rule in the appellee's favor on this question here. Were you planning to appeal the default judgment? You dismissed that you separated the Syrian defendants out because you wanted to have a final judgment. Was it one that you intended to appeal? No, we weren't going to appeal. That's what I was saying. We weren't trying to manufacture appellate jurisdiction in this case at all. We just wanted to pursue these cases on two different tracks, as we think is appropriate, given the differences in the allocations. How about the personal jurisdiction? On personal jurisdiction, Your Honor, the argument that we've briefed most heavily and relied upon is waiver. In this case, after their personal jurisdiction motion was denied, the defendants willfully defaulted. And a willful default is a big deal. It can be left in place simply because it was willful. In this case, the way the defendants got out of their willful default is they told Judge Leon, we are committed to litigating this case on the merits. But how does that revoke their reliance also on personal jurisdiction defense? Your Honor, we think in this case what they said specifically to Judge Leon strongly implied that they were waiving it. And I want to make clear that this is an issue. So we're going to find waiver based on something less than expressed language? Your Honor, the language was very expressed. But I want to make clear that this Court's review of this question is for abuse of discretion. What was expressed about waiver when they said that they were reserving their defenses? Yeah. So I think the standard for waiver, for example, even when a defendant raises a defense in its answer, let's say, it can subsequently waive that defense if it doesn't do anything to pursue it and gives the Court the strong – the legal standard is if it gives the plaintiffs the impression that it intends to litigate the merits or a reasonable expectation that it intends to litigate the merits. But they had already moved to dismiss and that had been denied. That's correct, Your Honor. And then they willfully defaulted. I do think the default makes it very different here. Because what they could have done is a default judgment could have been entered against them. And they could have appealed on their personal jurisdiction defense, right? That's not what they did in this case. And the language about their commitment to litigate on the merits is very explicit. They have an affidavit submitted by their prime minister saying, we are committed to participating fully in the discovery process. We want to address these issues head on. We are happy to litigate and answer these claims in U.S. courts. And just about personal jurisdiction. So what that means is then they basically wanted to do what we said they could do in practical concepts. Instead of appealing the default and putting all their eggs in that basket, because if they had appealed that and lost, then game over, right? They couldn't raise their merits defenses, right? That's correct, Your Honor. So they said, well, maybe we don't want to do that. But I think they did something very different. So just to be clear about what was happening at the time, the Palestinian Authority and the PLO had a change in leadership. And that change in leadership led to them taking a different substantive position about the virtues of defending this litigation. They had a policy, basically, of defaulting on all of these cases. And then they turned around and said, no, what we really want to do is we want to clear our names. We want to confront these allegations. And I think that when they do something like that as the predicate for getting out of a default, it's very difficult to say that the district judge abused his discretion by vacating the default, relying on those representations. But let's look at the whole reason we have this waiver by conduct jurisprudence. It's so that the district court doesn't waste its resources and the parties don't waste their resources on discovery and litigating the merits when the defendant could have raised personal jurisdiction and then if the district court had agreed with that, you wouldn't have needed to go to that second step. Here, that personal jurisdiction was raised. It was rejected. So what harm was done by the defendants in this case saying, well, now we want to litigate the merits? What harm was done that is consistent with this whole reason that we have the waiver doctrine? So, Your Honor, I want to be clear that waiver by conduct is really only part of our argument. But I think the better part of our argument is that they said things to the district court to induce it to vacate the default that were essentially we are committed to litigating this case on the merits. I mean, that is an all-caps, bold statement in their brief. So how is that any different than them just saying we want to proceed as practical concepts said that we can proceed? Your Honor, I think if they had said something like that, if they had said we want to preserve our appellate rights in our personal jurisdiction argument and also litigate the merits, the district court could have made a decision. Or if they wanted to preserve, their more prominent defense of their initial motion was based on foreign sovereign immunity. If they said, and they've let that one go, if they wanted to say that's what we want to do. So they let that one go explicitly, right? Well, they haven't raised it in this appeal is what I mean. I mean, they didn't say anything different about it at the time. But I think it's just been understood through the way they subsequently litigated it. So, for example, they did have a one-sentence statement in their answer that said there's no personal jurisdiction. But they never filed another motion to dismiss. They never filed a motion to dismiss based on the theory that they're asserting now at any point. They never argued this point in their summary judgment motion. They only brought it up after the Daimler decision. And I think that it's very difficult to say that when they litigated that much, after having made these express representations to the district court, that they've preserved the defense in any meaningful sense, Your Honor. Or at least that it was an abuse of discretion for Judge Levy to file it. The grounds for denying the personal jurisdiction motion were basically a holding that there was general jurisdiction because of the activities that the PLO undertakes in the U.S., both with the U.N. and here in Washington, right? That's by no means clear. The motion was denied in a minute order, unaccompanied by any reasoning. I looked at the reasoning, and the reasoning said that, right? So I believe their personal jurisdiction motion was just denied in a very brief minute order. I looked at... Now, the personal jurisdiction argument was later discussed. 278 page 2. Sorry. Docket entry 278 page 2. You don't have it in your appendix. I think I had to find it on the district court docket myself. But that's the ruling. Oh, so that is the motion for reconsideration that was subsequently filed later. Right. I'm talking about the initial personal jurisdiction motion filed before their default. So we're just talking about different orders. It's true that their motion for reconsideration was denied, but it was principally denied on waiver grounds. And in the course of explaining that, sure, Judge Leon talked about what he might have been thinking about earlier. But I think that that's a different thing altogether. They had every reason to continue pressing their personal jurisdiction argument in the beginning of the case if they thought they had a live defense. But they didn't. In fact, they didn't even identify it as one of their potentially meritorious defenses that justified vacating the default. I see that time is quickly going. If I could move to the subsequent... I would like to ask you, if we find no waiver, what would you say you would seek in jurisdictional discovery? So we have preserved... So first, we've preserved for further review the argument that these folks lack the ability to raise due process challenges to personal jurisdiction. We understand the circuit's precedent doesn't allow that at this time. We would seek in jurisdictional discovery potentially evidence indicating that they knew that this conduct was going to be directed at the United States. But I think that the principal arguments are really legal, not factual, about why there is no... why the personal jurisdiction defense has been waived or why they can't assert it in a case like this one. And it's very clear that Congress intended for Americans who are killed in terrorist attacks to be able to sue in U.S. court. That's made clear time and time again. So really the question would be whether constitutionally Congress was allowed to do that, and we would litigate that question on further review if necessary. Can I ask you something about your secondary liability theories? Yes, Your Honor. And that is, do you agree that you need to have a link to a foreign terrorist organization to press those claims? That's correct. Right. And so don't you still need the Nizal linkage that was missing to give you the linkage to the PFLP here that was missing at primary liability? Don't you also need to have that established here? I don't believe so. I think that it is clear that the bomber, Hafez, was acting on behalf of the PFLP. I think it's clear that the defendants provided multiple forms of support to the PFLP. If you look at pages 27 and 28 of our opening brief, we have like a bulleted list where we describe all the ways that they provided support, and only some of those forms of support go to Nizal. Other support that they provided to the PFLP included paying the rent for the PFLP's office in Kalkilia, and the Kalkilia cell is the one that undertook this bombing. They provided the PFLP's second-in-command with a car and driver service and an apartment so he could attend executive committee meetings for the PLO. They made, of course, the payments to Nizal, but they also made payments after the fact to Hafez, the bomber, and we argue that those are also support for the PFLP, a conclusion that's supported by the district court decisions in Lind and Miller that we cited in our brief. So there's a multifaceted array of support that they're providing to the PFLP, even independent of Nizal, and then even if Nizal had nothing to do directly with the bombing, it's undisputed that Nizal was involved in the PFLP. He was the elected head of the Kalkilia government and the head of the militant wing in Kalkilia, and so even if we don't have direct evidence that he participated in the bombing, the support to Nizal is still support to the PFLP, which carried out the bombing. Now, I will also say just on this point about Nizal, one point that I want to make really, really clear in this argument is that there are three pieces of direct evidence linking Nizal to the bombing that were excluded as hearsay. Even if you exclude those, we have what I would describe as strong circumstantial evidence that he was involved. The Kalkilia cell carried out this attack. He was the leader of the cell. It was a small cell, and it's almost impossible that in a small cell like that, the leader, the guy who's run all of their militant operations for years and years and years and is one of the most senior commanders in the PFLP, is going to be out of the loop when they carry out one of their most major terrorist attacks. And so even though Judge Leon quibbled with the specific evidence, we had three people say he was involved in this. Even though he quibbled with that specific evidence, even if you don't give it to us, I think we can win that argument. Now, I do think all that evidence should come in for the reasons we've given. The Boer testimony, if all he was doing was repeating the contents of either media accounts or intelligence files, which are hearsay, so if you strip that out, what do you have in his testimony that actually did the linkage as opposed to relied on hearsay to have a linkage? As he times up, I'd love to answer. Please. The premise of the question is all he did was parrot these hearsay statements. So let me start with that one. If that is true, the testimony is nevertheless admissible because of the special character of 30B6 witnesses. 30B6 witnesses are not only supposed to testify on the basis of their personal knowledge. They're testifying as mouthpieces for the entities that designate them. And anything they say, it is understood that they will aggregate knowledge from all of the sources that inform the entity. But the media is not one of the entities for which they were speaking. Well, he doesn't have to be speaking for the media. No, he says that's where the information came from, was not his role in this entity, but from the media. Well, that's correct. But I think that what he's saying is, so his role at the time was to be with the General Intelligence Service in Calcillia, and then he was subsequently promoted by the time of his deposition. And what he actually said is, in preparing this deposition, I relied on the information in our intelligence files, and I looked at Nizal's file because I knew he was involved in the bombing. And then the questions were asked, well, how did you know? And he answered those questions by saying, well, I saw a reference to it in another one of our files, the file about Hafez, the bomber. I saw a reference to Nizal, and I also saw that the Israelis had accused him, and I saw that in the media. Now, he's saying that's how he came to know. And that may go to the weight of his testimony. But in terms of whether it is admissible, Federal Rule of Civil Procedure 32 is very clear that the testimony of a 30 v. 6 witness can be introduced against the entity that designated him for any purpose, a deposition or a trial, or a summary judgment or a trial. And the other rules of evidence that we pointed to. But just to be clear, so if he had rephrased his things or put the two lines together in response to the question, why did you pick his file? You knew he was, did you know he was involved when he said, the media said he was? You're saying that would be admissible? I'm saying. Because he's a 30 v. 6 witness. That would be a harder, the statement would be admissible, it just wouldn't be very weighty. It would be admissible, it would not be hearsay in a phrase that way. I think that's, I think that's correct. Well, if he's saying here is what I as the representative of the entity know, then, you know, how he comes to know it is just a question that goes to the weight. It's not a question of admissibility. And the reason for this, this is in the Sarah Lee case that we cited, is that when a party designates a 30 v. 6 witness, it is saying, okay, you go and you speak for us. And there is no concern that they don't have the ability to cross-examine, you know, the underlying sources on which he's going to rely. They get to control him in his preparation of that testimony. And so I'll just be clear about this. We have cited multiple cases saying that when you have a 30 v. 6 witness, even if what the witness does is recite hearsay, that testimony is admissible and qualms go to its weight. They have zero cases saying that when you have a 30 v. 6 witness, the testimony is inadmissible if it is predicated on hearsay. And that has to be right, because if you think about 30 v. 6 witnesses generally, they're always drawing a witness. The witnesses are relying on things like business records and talking to people within the organization to understand how the organization operates, what procedures it uses, what documents mean, you know, all of those sorts of things. I mean, that's what the rule is contemplating. That's not really this. I think it is. I think that he's commenting as a member of their intelligence services about the sources that they looked at. Now, he's not pellucid about all of the sources. As it's clear, he looked at both the intelligence files and the media reports, and it's certainly not clear at all that all of the information came in the first instance from the media reports, as opposed to any other intelligence gathering. And as I would say, all of those are very reasonable points to make to a jury about the weight of this testimony. Right? And to be clear, we also have two other pieces of testimony, you know, that were excluded as hearsay that say the same thing, that are from folks who were firsthand involved on the PFLP side of this bombing. Right? So I don't want to allow this focus on Dabur's testimony to derail us from the point that there is a lot of evidence linking Ryan Nizal to this bombing. And, you know, that evidence is not about 30 v. 6. That was admissible evidence. That was not admissible because it didn't meet the requirements for a hearsay exception. Right? So the argument that was made and accepted was that those were not statements against interest. And we've explained in our briefs in considerable detail why they were. These individuals firsthand implicated themselves in this bombing. Alam Khabi did so by saying that the cell in Nablus participated jointly with Ryan Nizal. That's Khabi's own cell implicating him in the bombing directly. Mohammad Wasif implicated himself in the bombing by saying that he was the bridge who brought the bomber, Hafez, and Nizal together, and that Nizal then authorized the bombing. That implicates himself. No, so maybe the bridge statement would be an inculpatory statement, but saying that Nizal was there, too, doesn't inculpate. But to have a bridge, you have to have something on either side of it. One side is Nizal, and the other one is Hafez. Does it mean they're both inculpatory? Does it? I think it does. I think saying I introduced the bomber to Nizal in my capacity as Nizal's subordinate in the PFLP is an inculpatory statement for sure. And then I guess what you're asking, Your Honor, is the subsequent statement that Nizal authorized the bombing also inculpatory? I think it certainly is because you're saying I put in motion this chain of events that led to the bombing. You're not just saying completely unrelated to the thing that I did, Nizal organized the bombing. You're saying this was my role in the bombing that Nizal organized, and I think that that is an inculpatory statement. And I would just analogize it, Your Honor, to, you know, there are lots of cases in which people identify other members of conspiracies while identifying themselves, and those statements are frequently held to be inculpatory. They're held to be exculpatory when what it looks like the declarant is doing is trying to say it wasn't me, it was other people, right? But when the declarant is saying I did this with him, that's a different story, and that's inculpatory. And it shouldn't be a high bar for this exception to the hearsay rule to be met, because the point of the exception is, you know, they're not going to say these sorts of things unless they're likely to be true, and that's the type of statement that you would not make to Israeli authorities falsely. I don't think he was in custody in Israel at the time. So I think that the statement is credible enough to come in. And, again, if the defendants want to raise qualms about the weight of this testimony, they should do so, but they should do that in front of a jury. And also, just to preface all of this, as I said at the beginning, I don't even think we need any of this evidence to get to a jury, so really what we're talking about here is how strong our case would be at trial, not whether this court should reverse on the liability finding or not. I see I've gone considerably over. I'm happy to answer any other questions. Thank you. All right. Mr. Berger? Good morning, and may it please the Court. I'll start with jurisdiction, as you asked Mr. Singh to start with jurisdiction. On appellate jurisdiction, we know the two cases are the same case. Judge Leon at this is page 281 of the joint appendix said the two cases arise from the same tragic event, quote, unquote. The whole purpose why Judge Leon stayed the second case was because he knew there would be efficiencies from resolving the first case. And, indeed, the case- He didn't consolidate them. He didn't consolidate them. He could have. He could have, but he didn't. He didn't. And, indeed, he treated his judgment in this case as final, and we're prepared to meet the ball on that because we think there is no jurisdiction in any event under personal jurisdiction. We responded on this issue because the Court raised it sua sponte when we submitted it. We think there is a clear case that appellate jurisdiction was manufactured here because these were- How did they manufacture appellate jurisdiction by dismissing a case 13 years before the final judgment? In order to obtain a judgment, they would have had no intention whatsoever of appealing to get a default judgment. They're- They're incredibly prescient. Well, and I'll give them credit for that. It is that they dismissed it precisely to streamline the case so that as we sit here today, we would be having this conversation rather than being still in the district court, as they knew would be the case. And that's the reason why they told the district court they wanted to split the case was for efficiency purposes. Well, there's all kinds of efficiencies. Normally efficiency is a good thing in litigation. And they wanted to get a default judgment, which of course they would not appeal, and get that case cleaned up and over and done with. I don't see anything wrong about that. I apologize. I don't think appeal was the consequence. The reason why they wanted it, what they wanted was finality. They wanted finality in the default judgment because that's how they would begin collections efforts. So whether they proposed to appeal or not- But Blue is all about manufacturing appellate jurisdiction. That wasn't what was going on here. You would agree with that. I do, but it comes by way of manufacturing finality. The whole purpose, as Blue identifies, is not to use self-help methods to achieve what would otherwise be something they could have asked the court to do. Right. So this is not a manufacturing appellate jurisdiction. Your objections are just manufacturing- No, I don't agree. A final jurisdiction? No. What I'm saying is they manufactured appellate jurisdiction rather than going through the district court, which they should have done, and asked for a certification of that part of the case. In this case, they were going to ask for a 54B certification. There were no claims and no parties left in this case. And what I'm saying is that's how they should have done so in order to do it. In this case, after summary judgment was entered, they should have asked for 54B from this district court? I think we all behaved as though the case were final because that was the cue that the district court gave us. But when it's telling that at no point did they seek a, you know, remand for an indicative ruling on a certification issue because obviously they believe they haven't manufactured appellate jurisdiction. We believe the case has been split. The district judge thinks the case has been split. But I'll grant you, the district court also thinks that this case is over. And I'm content with that. Our goal was to answer the court's question here. We think it is far from a clear case that appellate jurisdiction wasn't manufactured here, but the reality is there's no jurisdiction in any event, even if there's appellate jurisdiction. So it's not my role to concede appellate jurisdiction. Obviously, my role was to answer the court's question on whether or not we think they've manufactured it. We think that they did. But regardless, we think the court does not proceed beyond the issue of jurisdiction because of the personal jurisdiction issue. And I'll sort of put myself aside.  You didn't cross the field on jurisdiction. Nor did we need to. So this is exactly the case. Oh, you absolutely needed to. I think under both the implicit ruling in the Gilmore decision of this Court, which presented exactly the same procedural scenario, the explicit holding in this Court's decision in Jones v. Bernanke, which is 557 F. 3rd. 670 at 676, says as follows. A party that prevails. Is that in your brief? No, Your Honor. But I'm responding to a point that was made in the plaintiff's reply. And so I am responding to that now in an oral argument and in terms of an issue they raised by subsequent to briefing 28 J letters. Whereas, Your Honor, those were constrained to 350 words. We gave Your Honor our best authority on that. But we have additional authority that I think answers this question. Jones v. Bernanke says a party that prevails entirely in the district court needn't cross appeal an adverse interlocutory order who urged the rejected argument as an alternative ground for affirming the final judgment. Yeah, but this isn't an alternative ground for affirmance. That's the problem. We've got a lot of cases that say you can argue all kinds of alternative grounds for affirmance, including ones where you would disagree with the district court, but you don't want affirmance. We do want affirmance. You want vacature. No, no, no. Personal jurisdiction results in vacature. That's well established. No, I don't think so, Your Honor. I respectfully disagree. I think it is possible to affirm alternatively with a judgment that would dismissal it as without prejudice on the basis of jurisdiction. This is precisely what the court tells us in the Gilmore decision, which also involved my clients, that jurisdiction must be considered first. There was no cross appeal in Gilmore. This is what the Kaplan v. Central Bank of Iran case decided by this court a year and a half, two years ago tells us, which is jurisdiction, if it has been preserved in the district court, must be addressed first because without it, the court has no power to proceed. It is no different in that respect. Once preserved in the district court, then appellate jurisdiction. The court cannot proceed and preserve the court. Right. We had cases that said personal jurisdiction has to be raised by, sorry, personal jurisdiction is not an argument for affirmance because it would result in vacature. Then on what basis would we have that issue? And because you didn't cross appeal, nor did you show exceptional circumstances, which our courts have required when there's a failure to cross appeal, then on what possible basis would we entertain this argument? Because this is precisely the scenario, as I said, is when we raise jurisdiction and the court acknowledged its obligation to address it first in Gilmore. The entire purpose of cases like Bernanke is to say, to borrow a page from your book, Judge Millett, that efficiency means do not burden the court with a fourth brief with a cross appeal argument that could otherwise be raised as they were here in the red brief and the gray brief on appeal. There's no question that we understood from Gilmore and from cases like Jones that jurisdiction was available as an alternative ground for affirmance, albeit on dismissal without prejudice. We followed the Gilmore model in doing that here. And we have circuit precedent that's telling us, please don't waste our time with a judgment when it's an interlocutory order below and you've prevailed entirely on the final judgment. I think that if efficiency is the goal here, much as the Court's questions about appellate jurisdiction, then we find ourselves in exactly the same position when it comes to personal jurisdiction. We raise personal jurisdiction so often below it hardly could come as a surprise. Indeed, in briefing in the district court, we began to get, when we moved for reconsideration repeatedly, responses both from the district court and from the plaintiffs that enough already. You've raised this multiple times. We've heard plenty. For the court to overlook its lack of power here because of the absence of personal jurisdiction over the defendants on what is purely a debate between some cases like Jones v. Bernanke, the implicit guidance of Gilmore, and the cases that Your Honor has in mind, would be to force these defendants to forfeit against their will a constitutional defense that they fully preserve. When did you move for reconsideration before 2014? We didn't move for reconsideration before 2014, nor did we have to, because once, as Your Honor pointed to practical concepts, I embraced that case fully. What that case says is when you're done, you're done. And, indeed, Jones, the same Jones v. Bernanke case that I cited, says not only are you done, but you don't have to raise it again on summary judgment. So your omission of a previously raised and lost defense in your summary judgment motion, another one of their arguments, doesn't forfeit it either. Well, why shouldn't you have to raise it after a good year in 2011? Well, Your Honor, I think this Court answered that question several months ago in Clemen. I know that in Gilmore there was some debate on what was the touchstone for the change in the law in general jurisdiction. Clemen resolved that issue for this circuit and said, okay, sure, there is some similarities between good year and Daimler, but Daimler is the touchstone. And that's resolved now as a matter of circuit law, that Daimler is the right time. And within three weeks of Daimler, we moved for reconsideration on jurisdiction. It fits the Clemen model precisely. I know you rely on, for obvious reason, our decision in Livnot as very important to your personal jurisdiction argument. When did you tell the district court, alert the district court about our decision in Livnot, which was three months before summary judgment? Your Honor, I know we did. I don't know. I couldn't find it anywhere. You can tell me where and how you got it. I'm sure it's in both our motions for reconsideration and in our summary judgment briefing. Your Honor, we didn't put in, in accordance with circuit law, the entirety of our briefing. But even if we hadn't, the district court, when it decided its summary judgment motion, our summary judgment motion, fully reviewed the law on summary, on personal jurisdiction. And here's an important part, and it relates to both what Judge Henderson asked Mr. Singh about jurisdictional discovery, and it relates to the arguments that merits argument on jurisdiction. What they have done is they said, we are arguing a waiver. And if we're wrong about waiver, we reserve two alternative arguments. One, that the defendants are not entitled to due process. Livnot put the end to that reserved argument. Their other reserved argument, they said, is that the Anti-Terrorism Clarification Act provides an alternative basis for jurisdiction. Kleeman disposed of that argument as well as a matter of circuit law. They have not preserved, nor did they make in their brief, any argument that says, oh, Livnot doesn't apply, or Kleeman doesn't apply. And, indeed, what they have not done is challenged in any way a connection between the underlying events in this form. It all turns on waiver, and it turns on two other pure issues of law that have been disposed of. And there is no question that the district court committed three legal errors, three fundamental errors in legal rules that, by definition, equate with an abuse of discretion. I know Mr. Singh was anxious to tell you that it's abuse of discretion review here on the waiver only. But here are the three separate applications of erroneous legal principles the district court engaged in in finding waiver. Number one, submission to jurisdiction by making a promise to litigate on the merits. But how can we do otherwise? Rule 55 requires that we say we have a meritorious defense. That is what we are obliged to do. But, further, it was not something where we ever said we would waive our jurisdictional defense. At the joint appendix, page 183, the defendants said in their motion to vacate default, we will no longer rely exclusively on jurisdiction. Simultaneously, they submitted a proposed answer that preserved the jurisdictional defense. I know Mr. Singh said to you, well, you know, the question is reasonable expectations of the plaintiffs. That is not the standard. It has never been adopted in the circuit. That is not the standard. The question is whether you communicated to the court and parties consent. And you didn't raise it in your summary judgment motion. I could find no filing anywhere where you told the district court about our decision in LIVNet. I could find nothing. You told them about the district court in LIVNet, but you never told them about ours, which is now one of your most central arguments on appeal. And then you didn't cross-appeal. And so why don't those things, combined with the other things the district court was worried about, suggest that you have waived personal jurisdiction, either in the district court or on appeal, by not cross-appealing, by not demonstrating exceptional circumstances, and by never having told the district court about our decision in LIVNet? Well, I'll take the last bit first. Certainly district courts are presumed to know the law of this circuit, but more importantly, in context. That's not the point. The point is whether you made clear to the district court that you were continuing to press the personal jurisdiction objection. The district court didn't think you were, and then wasn't told, wasn't raised again in summary judgment. No. It's easy enough to say, we know you've already rejected this, but here we go. So I'll break it down in terms of moments in time. Number one, the 2003 motion to dismiss raised personal jurisdiction, and the plaintiffs litigated on the merits. The judge, in granting the motion to vacate the default, expressly acknowledged that he had resolved the motion to dismiss on grounds of personal jurisdiction. When the motion to vacate was made, jurisdiction was preserved. When summary judgment was sought, the you can find this in the district court record at docket entry 247-2 at pages 3 to 4. It's partially reproduced. I'm sorry. Is that a JNA site you have for me? It's partially reproduced at 272, but the entirety of pages 3 and 4 is at docket entry 247-2 of 3 to 4. The summary judgment motion that the defendants made stated their understanding that the jurisdictional defense had been resolved by their motion to dismiss. So in any event, while summary judgment was pending, within months of having made the motion, defendants made their first motion for reconsideration. Summary judgment hadn't been resolved. That effectively supplemented the summary judgment motion. Your Honor, I'm moving forward in time to cover all of the points here. Thereafter, once we moved for reconsideration, the district court at no time examined or expressed interest in the merits theory on jurisdiction and looked exclusively at the question of waiver. We met the ball on waiver. The failure to submit what would be the equivalent of a supplement to a motion for reconsideration, if indeed we did that, should not waive under these circumstances a personal jurisdiction defense, particularly when the entire interval of time between when we moved to vacate the default, and that was granted, and when we moved for reconsideration was spent conducting merits discovery. That is exactly the same scenario as in Clement. Mostly, plaintiffs do not regard themselves as prejudiced when what they do is spend their time doing merits discovery, which is what they want. So neither the district court nor the plaintiffs have ever identified a single step that they had to take before reconsideration was made that was a needless step that would not have been taken in the ordinary course. Under these circumstances, a failure, if that's what it was, Your Honor, to submit in essence a notice of supplemental authority cannot stand against what are the clear direction of Jones v. Bernanke and the implicit direction of Gilmour that we need not cross appeal on jurisdiction in order to preserve it as an alternative ground for affirmance. Okay. So our decision in Spann said you need to cross appeal to preserve personal jurisdiction. If you don't, you have to demonstrate exceptional circumstances. Do you have any exceptional circumstances for not having cross appealed? Well, number one, I don't think we had to as a matter of law. I'm just telling you what our case says. Just please answer. Do you have exceptional circumstances? I appreciate, Your Honor, that that's the summary of Spann, and you've heard my point on what the law is. The answer is yes. I have given you what I think is a list of a half a dozen exceptional circumstances where these defendants have gone out of their way to preserve personal jurisdiction as a defense. No, why you didn't, exceptional, let me be clear, what exceptional circumstances did you have that prevented you from filing a cross appeal? We didn't believe we needed exceptional circumstances because we did what we did in Gilmour where we raised after a summary judgment personal jurisdiction as an alternative and the court in its opinion acknowledged that that was the court's obligation. Consisting of the Catholic... You said you hadn't preserved personal jurisdiction in that case for other reasons, and so nowhere said you don't have to do it or that our decision in Spann is overruled. Your Honor, I just, I can see that we're... I just want to, I just want to, I don't want to go back and get, it sounds like you don't have exceptional circumstances. You just have a difference. I believe we do. I don't know what else I could say. I'll start my list with the fact that we believed, having followed the model that worked in Gilmour for raising after summary judgment in favor of our clients in precisely the same scenario where a waiver holding was made and we briefed jurisdiction as an alternative grounds. And I might add the plaintiffs did not even challenge it in their reply brief. Belatedly in a 28-J letter, which is not an appropriate way to raise this issue for the plaintiffs, they raised after full briefing that we thought there should be a cross appeal. So therefore, it's not even preserved by them as an argument in their brief because the law is also clear in the circuit that a 28-J letter is not a proper vehicle for raising a numerics argument omitted from the briefs. The array of circumstances here realistically favors the defendants of having preserved this argument throughout the appeal and stacked against those of the plaintiffs. And that is why we think it would be depriving these defendants against their will and against the record of their constitutional right to due process personal jurisdiction defense to find that it hasn't been preserved simply because we did hear what we did in Gilmour and simply because every court, including Kaplan and other anti-terrorism act case, said the court's first obligation is to examine its jurisdiction over the  And that's not a case that we've preserved below. We've preserved it below. I'm happy to address any other questions the Court may have, but I see I'm over my time as well. Thank you. Thank you, Your Honor. All right. Why don't you take two minutes? Sure. I'd like to just say two quick things about personal jurisdiction and then briefly on some of the stuff we haven't talked about. On personal jurisdiction, first there's the question of the Clemen case. And I think the big distinction between this case and Clemen is that in Clemen, the case came out the other way in the district court. And this court reviewing for abuse of discretion was very deferential to the district court's finding that there had been no waiver. The same reasoning dictates, of course, the opposite result in this case. And if you look at the language of the Clemen opinion, it's very clear that the standard of review plays a huge role. And then this is the second point I would make. If you look at our reply brief pages 7 through 9, we quote the language that they gave to the district court. And then I'd commend you to pages 293 through 295 of the joint appendix, which is where Judge Leon, in discussing the other side's motion for reconsideration, refers back to these representations that they made. And he said, look, I clearly understood you to mean that you are not taking this case forward on jurisdictional grounds. I granted you the extraordinary relief of vacating your willful default precisely because you told me you were committed to the merits. And so I think that here the standard of review does considerable work for us. If we think that he's just wrong as a matter of law based on practical concepts by taking that interpretation of the facts, then that's an abuse of discretion, right? I don't. So, Your Honor, I don't see how he could be wrong as a matter of law for taking that interpretation of the facts. I think that there's no law in this circuit that says a defendant can't, by saying something to a district court, waive personal jurisdiction. And I think what he's conveying is his clear understanding of what they said. And I think once you read what they said, it's crystal clear. The only sentence that they point you to is this one about, you know, we're not going to rely exclusively on jurisdictional defenses. But in our reply brief, we point out that wasn't even a statement about this case. That was a statement about terrorism cases generally. For this case, they were crystal clear that they only wanted to litigate the merits, really. And I think that, or at least it was not an abuse of discretion to find that that's what they were saying to Judge Leon, to cause him to grant extraordinary relief. The only last thing I want to say, if you'll allow me, is that there are a couple of issues that were decided by minute order. Is it reply? Are you replying to something you're? No. Is it? Okay. And so, I would urge you, please do. Thank you. Thank you.
judges: Henderson, Millett, Wilkins